MISSOURI–KANSAS–TEXAS RAIL-
ROAD COMPANY, a Corpora-
tion, Appellant,

v.

Bernice MATHIS, Mother, Natural Guard-
ian and Next of Kin of Franklin
Dewey Mathis, deceased, Appellee.

No. 7999.

United States Court of Appeals
Tenth Circuit.

Aug. 17, 1965.

Rehearing Denied Sept. 16, 1965.

John J. Jurcyk, Jr., Kansas City, Kan. (Willard L. Phillips, P. B. McAnany, Thomas M. Van Cleave, Jr., James J. Lysaught, R. H. Foerschler, Robert D. Benham, Kansas City, Kan., William A. Thie and Lloyd W. Jones, Denison, Tex., with him on the brief), for appellant.

John E. Shamberg, Kansas City, Kan. (Joseph Cohen, Charles S. Schnider, Joseph P. Jenkins, Barton P. Cohen, Jacob F. May, Jr., Frederick K. Cross, Norma Braly, Kansas City, Kan., and Oren Gray, Parsons, Kan., with him on the brief), for appellee.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Plaintiff-appellee's 12-year old son was killed while playing in the appellant-defendant's railroad yards at Parsons, Kansas. The jury awarded her $15,000 damages and the railroad appeals urging the insufficiency of the evidence and errors in the instructions.

At Parsons the railroad has switching and classification yards which are in the shape of a diamond, have 36 tracks at the widest point, and run in a north-south direction through a populated section of the city. From a lead track, which forms the perimeter of the diamond, cars can be switched onto any of the tracks. The fatal accident occurred on track 14 in the northwest sector which for several months had been used to store 300–400 freight cars awaiting repairs or other disposition. The yards were unfenced and no "keep out" or "no trespassing" signs were posted in the northwest sector. The depot and yard house where the public customarily crossed the yards were about one mile south of the point of the accident.

Children played in the yards. Boys used one of the old cabooses as a club house where they were visited on occasion by railroad employees who did nothing to stop the practice. The railroad took no special precautions to keep unauthorized persons out of the yards. It had no guards or police to secure the yards other than one special agent headquartered in another state.

Cars for storage or classification were switched off the perimeter lead track onto a selected interior track. They were "kicked" and the engine detached so that they rolled down the chosen track. Normally no member of a switching crew rode the cars to rest after they passed the switch unless the cars were going too fast. At ordinary speeds the cars either rolled to a stop or were stopped by cars already standing on the track.

On the afternoon of the accident the deceased and a friend had entered the yards and met two other boys. All but the deceased went to the caboose which was used as a club house. A short time later the three boys heard a loud noise, went to investigate, and found deceased's body beneath a car near the middle of a string of about 60 cars standing on track 14. The car under which the body was found was marked "Hold for Disposition" and was described by the switching foreman as a broken-down car not fit for use.

Mumy, a member of the switching crew on duty at the time of the accident, testified that early in the afternoon from a point some 2,000 feet away he had seen some boys in the yards near where the body was found but he could not identify them. Nothing was done about their presence in the yards.

The accident occurred about 3:00 P.M. A string of cars had been switched from the lead track onto track 14, permitted to roll unattended, and finally stopped by the standing cars, one of which was the car beneath which the deceased's body was found. No one saw the accident. No warning was given of the movement of the cars. The record does not disclose whether a person between or under the cars at the accident site could have been seen from the track 14 switch. The stationary cars were moved several feet by the impact of the switched cars. Ap-

parently the deceased had been crawling under the car at the time of the impact and had been hit and caught by a dangling rod which was part of the braking mechanism.

The railroad says that a verdict should have been directed in its favor because the deceased was a trespasser and it did not violate any duty owed to a trespasser. A discussion of these contentions is necessarily related to the instructions of which the railroad complains.

The jury could have found from the evidence that the deceased was not a trespasser, but a licensee present in the yards with the consent and acquiescence of the railroad. The court instructed the jury in substance that persons on the property of others are not necessarily trespassers because, in some circumstances, a license or invitation may be reasonably implied. The court enumerated as such circumstances long continued custom or usage, the presence over a period of time of children on the premises, the existence of equipment and operations likely to attract a boy of deceased's age and experience, and the knowledge and acceptance of the situation by the railroad.

The case at bar is distinguishable from the Kansas decisions cited by the railroad. In Atchison, T. & S. F. R. R. Co. v. Potter, 64 Kan. 13, 67 P. 534, 56 L.R.A. 575, recovery was denied because of the absence of a "well defined path" at the crossing where the accident occurred. In the instant case evidence of long continued presence of children with the knowledge of the railroad employees takes the place of physical evidence of a well defined path from which to impute knowledge. The evidence in Atchison, T. & S. F. R. R. Co. v. Todd, 54 Kan. 551, 38 P. 804, disclosed no history of children playing in the yards. Malott v. Union Pac. R. R. Co., 99 Kan. 115, 160 P. 978, concerned an adult who had seen and ignored a warning sign. Wilson v. Atchison, T. & S. F. R. R. Co., 66 Kan. 183, 71 P. 282, was a case in which a 12-year old boy was injured after jumping onto a moving train. The facts in Atchison, T. & S. F. R. R. Co. v. Smith, 28 Kan. 541, were somewhat similar to those of the case at bar except that the yards were not in the heart of a populous area. In that case the court left open the question of liability for an accident occurring at railroad property located in the heart of a city and frequented by children.

The trial court cautioned the jury that repeated trespasses would not establish implied consent unless considered with all the other circumstances of the case. We find nothing in the Kansas law which forbids an instruction on license when substantial evidence shows the use of the premises by children for play over a long period of time with the knowledge and acquiescence of the railroad employees.

The railroad complains that the court erroneously instructed the jury on the attractive nuisance doctrine. As we read the instructions the clear meaning was that the jury might consider the attraction only as a factor in determining the existence of invitation or consent to the deceased's presence. The duty of care owed to a child trespasser under the attractive nuisance doctrine is not substantially different from that owed to a child licensee. See Restatement (Second), Torts § 343B. The elements of license are knowledge and awareness on the part of the defendant of the entry of others on his premises and his manifest consent and acquiescence therein. The instruction permitted the jury to infer knowledge on the part of the railroad from an awareness of the custom and proclivity of children to play in the yards. It neither injected the issue of attractive nuisance nor permitted an inference not otherwise warranted by the evidence.

The railroad argues that the court should not have instructed the jury on its duty towards trespassers because no evidence showed a violation of any duty owed that class. The objection is not well taken because from some of the testimony the jury could have found not only that deceased was a trespasser but also that the railroad failed in the duty which it owed to trespassers. The switchman Mumy knew that children

were playing in the yards and sent the string of cars down track 14 unattended, without warning, and without any effort to ascertain the then whereabouts of the children.

■■ In Kansas an occupier of land owes a trespasser only the duty to avoid an intentional, wanton, and reckless injury to him. See Atchison, T. & S. F. R. R. Co. v. Baker, 79 Kan. 183, 98 P. 804, 806, 21 L.R.A.,N.S., 427, and Carson v. Atchison, T. & S. F. R. R. Co., 103 Kan. 138, 172 P. 1000, 1001. The railroad contends that in defining the phrase "intentional, wanton and reckless conduct" the court included the terms "heedlessness" and "rashness" and thereby imposed a duty approaching that of mere negligence. Earlier in its charge the court clearly distinguished between ordinary negligence and conduct that is wanton and reckless. Even though rashness and heedlessness are not the exact semantic counterparts of wantonness and recklessness, the instructions as a whole made the correct distinction and did not mislead the jury.

Affirmed.